UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
v.                                 :     Criminal No. 05-408
                                   :
PEDRO JULIO PRANDY-BINNETT,        :
    Also known as Pepe,            :
            Defendant.             :

FILED
NOV 29 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**GOVERNMENT'S PROFFER OF PROOF IN
SUPPORT OF DEFENDANT'S PLEA OF GUILTY**

The United States of America submits the following proffer of proof in support of defendant's plea of guilty to Count Three of the Indictment in the above-captioned matter.

*Elements of the Offense.*

The essential elements of the offense of distribution of a mixture and substance containing a detectable amount of cocaine, in violation of 21 United States Code, §§ 841(a)(1) and 841(b)(1)(C), each of which the government must prove beyond a reasonable doubt to sustain a conviction, are:

      1.    That the defendant distributed a controlled substance.

Distribute means to transfer or attempt to transfer to another person. The government need not prove that the defendant received or expected to receive anything of value in return.

      2.    That the defendant distributed the controlled substance knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently.

The law makes cocaine a controlled substance.

### *Penalties for the Offense*

The penalty for distribution of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance in violation of 21 United States Code, § 841(a)(1), is set out at 21 United States Code, § 841(b)(1)(C). The maximum penalty, therefore, is:

(A) a term of imprisonment of not more than 20;

(B) a fine not to exceed $1,000,000;

(C) a term of supervised release of at least three years, after any period of incarceration;

(D) a special assessment of $100.

U.S. Sentencing Guideline, § 5E1.2, permits the Court to impose a fine to pay the costs of imprisonment, term of supervised release, and period of probation.

### *Factual Proffer*

Had this matter gone to trial, the government's evidence would have established the following facts beyond a reasonable doubt.

1. The investigation in this matter was conducted by the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Metropolitan Police Department (MPD), which utilized several investigative methods, including the services of a cooperating individual (CI), consensual monitoring of conversations, an undercover police officer (UC), and an electronic surveillance by means of court authorized wiretaps. Certain events in this conspiracy occurred in New York, Florida, Maryland, Puerto Rico, the Dominican Republic and Venezuela and were the subject of law enforcement surveillance in those jurisdictions including electronic surveillance by means of court authorized wiretaps.

2. This investigation disclosed that Raven Darnell Carroll (hereinafter Carroll) and

Walter Charles Webb (hereinafter Webb) were distributing heroin, cocaine and crack cocaine which they obtained or manufactured from cocaine and heroin Carroll received from sources in the Dominican Republic, Venezuela and elsewhere. In the summer of 2002 Webb engaged in several hand to hand narcotics transactions with a cooperating individual and an undercover police officer. As a result of this activity and other information the FBI sought court authorization for the interception of wire communications over Walter Charles Webb's telephone. Thereafter the FBI and the DEA in the Washington metropolitan area sought and obtained court authorization for wire interceptions over telephones being utilized by Carroll. In the course of monitoring Carroll's telephones the FBI and the DEA learned that Carroll had two sources for kilogram quantities of cocaine and heroin. Conversations intercepted during the electronic surveillance and physical surveillance conducted in association with those intercepted telephone calls disclosed that the defendant, Pedro Julio Prandy-Binett (hereinafter Prandy for brevity and clarity), was one of those two sources. A sample of those interceptions and related physical surveillance follows.

3. On January 12, 2003, at approximately 1:55 p.m., Carroll placed a call to Pedro Prandy who was utilizing a cellular telephone bearing the number (202) 345-1377, subscribed to Pedro Prandy, 620 Sheridan Street, Apartment 417, Hyattsville, Maryland 20783. The purpose of the call was to arrange a meeting regarding their drug trafficking. Prandy told Carroll to bring the "paperwork" with him when they meet. Carroll and his co-conspirators refer to money using the code word "paperwork." Prandy was requesting that Carroll bring money to him that Carroll owed for illegal drugs previously sold to Carroll by Prandy.

4. On January 12, 2003, Carroll called Prandy again at 5:14 p.m., and 5:26 p.m. to postpone their meeting until 6:00 p.m. and 6:30 p.m. respectively. Carroll asked Prandy if he had any information, and Prandy said that they would hear from them on Tuesday (January 14, 2003).

They agreed to talk further when they met in person. In this conversation Carroll was inquiring of Prandy as to when Prandy would have more drugs for sale.

5. On January 13, 2003, Carroll called Prandy at 7:18 p.m. and stated that they have a slight problem. They agreed to meet at the store in 20 minutes. The store referred to by Prandy and Carroll was Webb's Fish and Ribs, located at 1361 U Street, NW, Washington, D.C. At approximately 8:03 p.m., Carroll called Prandy and left a voicemail for Prandy to call him back on his cell phone. At 8:08 p.m., Prandy called Carroll back and Carroll asked him about the other job. Prandy said that he would be there in approximately 3 minutes. In this conversation Carroll was again inquiring of Prandy as to when Prandy would have more drugs for sale.

6, On January 13, 2003, at approximately 8:20 p.m., Pedro Prandy was observed meeting with Carroll in the alley behind 1361 U Street, NW, Washington, D.C. Prandy's vehicle, a white pickup truck bearing Maryland license plates 60J-923, was parked in close proximity to the alley and was occupied by a passenger described as an Hispanic male. This vehicle was registered to Manders Decorating, 9141 Brookville Road, Silver Spring, Maryland 20910. This vehicle was a vehicle supplied to him by his employer. Because the business is relatively small the FBI determined not to attempt to verify Prandy's employment there because of the risk that Prandy might be alerted to the investigation. Prandy told the CW that he was in the construction business.

7. On January 14, 2003, Carroll called Prandy at approximately 3:34 p.m., at the phone number subscribed to in Prandy's name, (202) 345-1377, and requested that they meet at 6:00 p.m. Carroll called Prandy back at 5:09 p.m. and had a conversation in code with Prandy regarding Carroll returning drugs to Prandy when they meet later that night. Carroll asked if he needed to bring the other equipment back. Prandy referred to the "equipment" as "boxes that are sealed" and replied that Carroll should bring them. They also agreed to change their meeting time to 8:00 p.m. Carroll

called Prandy at 7:23 p.m., and Carroll and Prandy agreed to change their meeting time until 8:30 p.m. at Carroll's request. In this conversation Prandy and Carroll were talking in code about Carroll returning kilograms of cocaine, referred to as "sealed boxes," to Prandy. This is a practice often encountered among persons trafficking in significant quantities of narcotics when they are dissatisfied with the weight or quality of a particular quantity of drugs.

8. On January 14, 2003, Prandy drove a white pickup truck bearing Maryland license plates 60J-923 to 1361 U Street, NW and parked in the alley behind Webb's Fish and Ribs at approximately 8:22 p.m. This vehicle is also registered to Manders Decorating, 9141 Brookville Road, Silver Spring, Maryland. Carroll arrived and parked in the alley with Prandy at 9:05 p.m. Carroll was driving his Toyota Avalon bearing Washington, D.C. dealer's license plates D-7470. Both Carroll and Prandy departed the alley in their respective vehicles at 9:23 p.m. Prandy drove his white pickup truck to 620 Sheridan Street, parked his vehicle and entered building "620" at 9:40 p.m. Prandy carried a white paper bag into the building.

9. On January 14, 2003, Carroll called Prandy at approximately 10:59 p.m. and they had a discussion regarding money that Carroll had just provided to Prandy, in addition to the returned drugs. Prandy made reference to a number that he just faxed to Carroll and stated that was what it was in the paperwork. Your affiant submits that Prandy was complaining that Carroll had not provided him enough money. Carroll said that one of those stacks had two in it. Prandy said that there was a lot of loose ones and single ones. Prandy then began to act as though he discovered more money and that possibly Carroll was correct. Prandy said he would fax him again. Carroll called Prandy back at 11:04 p.m., and told Prandy that he had put the paperwork together funny. Carroll had bundled the money in such a manner that Prandy initially thought that Carroll had not given him their agreed amount, and that Carroll was stating that he had packaged it differently.

10. When Carroll and Prandy met in the alley behind 1361 U Street, NW at 8:22 p.m. on January 12, 2003, Carroll was returning drugs to Prandy and paying Prandy for drugs previously supplied to Carroll by Prandy. After they met, Prandy transported the drugs and money back to his stash house at 620 Sheridan Street, Apartment 417, Hyattsville, Maryland.

11. Late in 2003 the FBI began debriefing a cooperating witness (CW) who identified Prandy as a large scale supplier of heroin and cocaine to the Raven Carroll drug trafficking organization, in which the CW was a participant. The CW identified a photograph of Prandy, gave an accurate physical description of him, and stated that they referred to him as "the painter," "the paint man," and "Pepe." The CW described the white work vehicles that Prandy drove to meet with Carroll. The CW also bought drugs from Prandy, but only after Carroll was murdered. The CW purchased heroin from Prandy on several occasions. The heroin provided to the CW by Prandy was of poor quality, and the CW did not pay Prandy for the heroin.

12. During the month of April of 2004, the CW placed consensually monitored calls to Prandy and met with Prandy on April 14, 2004. The CW wore a recording device when he met with Prandy in the same alley that Carroll met with him near the intersection of 14th Street, and U Street, NW. Prandy drove a gray colored Honda Element bearing Maryland license plates M999997, which is registered to Pedro Julio Binnett-Prandy, 1713 Lansdowne Way, Silver Spring, MD 20910. Prandy told the CW about his drug trafficking history with Carroll, and said that he sold Carroll approximately 5 kilograms of cocaine a week with Carroll on some occasions. In addition, Prandy admitted selling both cocaine and heroin to Carroll. Prandy informed the CW that his current prices are $24,000.00 for a kilogram of cocaine and $72 per gram for heroin. They agreed to meet in the future.

13. The CW maintained telephonic contact with Prandy periodically during the summer

and fall of 2004. In those conversations Prandy informed the CW that he was having a problem with his suppliers and could not provide drugs to him at that time.

14.     On November 30, 2004, the CW met with Pedro Prandy in the alley near the intersection of 14th Street, and U Street, NW, Washington, D.C., where Prandy provided him with a sample of powder cocaine. The sample of cocaine provided to the CW by Prandy was sent to the Mid-Atlantic Regional Laboratory where it was subjected to quantitative and qualitative analysis. A qualified forensic chemist would testify that it was 4.8 grams of 55% pure cocaine hydrochloride (powder cocaine). This meeting occurred in an FBI camera car and was recorded by a hidden video camera. Prandy did not charge the CW for the cocaine, but was offering it as a sample so that the CW could ascertain the quality of the cocaine to see if he wanted to purchase more.

15.     On December 3, 2004, the CW met with Pedro Prandy in the alley near the intersection of 14th Street, and U Street, NW, Washington, D.C., where Prandy provided the CW with 1/4 kilogram of powder cocaine. The CW provided Prandy with $6000 in pre-recorded FBI funds. The transaction occurred inside of a FBI camera car and was recorded by a hidden video camera. The cocaine sold to the CW by Prandy was sent to the Mid-Atlantic Regional Laboratory where it was subjected to quantitative and qualitative analysis. A qualified forensic chemist would testify that it was 246.0 grams of 55% pure cocaine hydrochloride (powder cocaine).

16.     On December 14, 2004, Pedro Prandy met with the CW again in the alley near the intersection of 14th Street and U Street, NW, Washington, D.C. During this meeting, Prandy provided a sample of heroin to the CW, and again did not charge him for it. The meeting occurred in a FBI camera car and was recorded by a hidden video camera. The sample of heroin provided to the CW by Prandy was sent to the Mid-Atlantic Regional Laboratory where it was subjected to quantitative and qualitative analysis. A qualified forensic chemist would testify that it was 1.4 grams

of 10% pure heroin.

17.   On June 23, 2005, the CW placed a consensually monitored telephone call to Prandy. During the telephone call the CW and Prandy made arrangements to meet in the alley behind 1361 U Street, NW, Washington, D.C. The purpose of the meeting was to make arrangements for another purchase of cocaine. As Prandy drove to the meeting he was arrested by agents of the FBI and officers of the MPD. A search of Prandy's person incident to his arrest resulted in the recovery of more than $10,000 in United States currency. Shortly thereafter law enforcement executed a United States search warrant at Prandy's stash pad at 620 Sheridan Street, apartment 417, in Hyattsville, Maryland. In that search law enforcement recovered a solid kilogram brick of cocaine and smaller pieces amounting to an approximately 600 grams more as well as numerous items for packaging drugs and more than $30,000 in United States currency.

18.   The suspected drugs purchased or seized in this investigation were submitted to the Drug Enforcement Administrations Mid-Atlantic Regional Laboratory where they were quantitatively and qualitatively analyzed by a qualified forensic chemist who would testify at any trial to the quantities and purities set out above in this Proffer.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

BY:  *William J. O'Malley, Jr.*
WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney

*Nancy B. Jackson*
NANCY B. JACKSON
Assistant United States Attorney

*Defendant's Acceptance*

I have read all nine (9) pages of the Government's Proffer of Proof and have discussed it with my attorney, G. Allen Dale, Esquire. I fully understand this document and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully. I am pleading guilty because I am in fact guilty of the offenses charged.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in the plea agreement. I am satisfied with the legal services provided by my attorney in connection with my plea agreement and matters related to it.

Date: 11-29-05

PEDRO JULIO BRANDY-BINNETT
Defendant

*Attorney's Acknowledgment*

I have read each of the nine (9) pages constituting the Government's Proffer of Proof, reviewed them with my client and discussed the provisions of the Proffer with my client, fully. These pages accurately and completely set forth the evidence as I understand it. I concur in my client's desire to plead guilty as set forth in the agreement.

Date: 11.29.05

G. ALLEN DALE, Esquire
Attorney for the Defendant